IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 7, 2017 Session

**STATE OF TENNESSEE v. JOSEPH L. SMITH**

**Appeal from the Circuit Court for Henry County**
**No. 15368     Donald E. Parish, Judge**

_____

**No. W2016-01229-CCA-R3-CD**

_____

Joseph L. Smith ("the Defendant") was convicted of attempted arson under a theory of criminal responsibility and received a three-year sentence; he was ordered to serve one year in the workhouse and the remainder of the sentence on community corrections. On appeal, the Defendant argues that the trial court erred in its denial of his motion for judgment of acquittal and his motion for new trial because the testimony of the accomplices was not sufficiently corroborated by independent evidence. The Defendant also contends that the evidence introduced at trial was insufficient for a rational juror to have found him guilty of attempted arson beyond a reasonable doubt and that the trial court should not have instructed the jury on the offense of attempted arson. After a thorough review of the record and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

James H. Bradberry, Dresden, Tennessee, for the appellant, Joseph L. Smith.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Paul Hessing, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

On July 7, 2014, the Henry County Grand Jury indicted the Defendant for arson under a theory of criminal responsibility.[1]  At trial, Officer Brian Davis testified that he was a patrol deputy with the Henry County Sheriff's Office.  On February 21, 2014, as Officer Davis was driving north on Highway 79 at approximately 1:00 a.m., he observed two individuals walking towards Paris on the side of the road, approximately 500 feet away from Smith's Tire Barn.  He stated that "[b]efore [he] could stop to make contact with them, [he] noticed a fire[]" at Smith's Tire Barn.  Officer Davis observed "flames coming out of the roof area around . . . the front door[]" of Smith's Tire Barn.  Officer Davis described the flames as appearing "pretty big[,]" like the building "had [not] been burning too awful long."  He explained that he did not see smoke coming from the building because it was dark outside.  Officer Davis contacted dispatch and requested fire units to come to the location; he then approached the two individuals who were walking and later identified them as co-defendants William Tomlan and Michael Alred.  While Officer Davis spoke with co-defendants William Tomlan[2] and Alred, "a vehicle . . . pulled up behind [him] and stopped in the center turn lane of the highway."  Officer Davis testified that the vehicle was a Dodge truck driven by co-defendant Diane Tomlan.  He identified all the individuals at the scene, "called for assistance to the scene, [and] secured the scene."  Officer Davis stated that he had no further interactions with any of the co-defendants and that he did not speak with the Defendant on February 21, 2014.

On cross-examination, Officer Davis testified that he did not escort the co-defendants to the Sheriff's Department, and he did not take any statements from the co-defendants.  Officer Davis testified that he completed an incident report related to the offense but that he did not have any information that connected the Defendant to the offense.

Steve McClure testified that he had worked as a certified fire investigator and explosive handler for the Bomb and Arson section of the Tennessee State Fire Marshall's Office for over sixteen years.  Mr. McClure stated that in general, a fire, police, or sheriff's department notifies him of a fire that is a "significant loss," that is suspected to be "foul play," or that has unclear circumstances.  After arriving at the scene of a fire, Mr. McClure stated that he "access[es] the scene" by looking at the exterior of the structure and talking to the owner about the value of the structure and whether the

---

[1] The co-defendants were indicted separately from the Defendant for criminal offenses relating to the burning of Smith's Tire Barn.

[2] Because two co-defendants in this case share the same last name, we will refer to those co-defendants by their first name.  No disrespect is intended.

- 2 -

structure was insured. He also speaks with witnesses and any first responders to determine what they observed. After the owner of the structure consents to an examination, Mr. McClure "continue[s] with an actual examination on the exterior, and then move[s] into the interior." In the interior of the structure, Mr. McClure "look[s] at the most significant burn, where the largest damage of fire is on the outside and that kind of gives [him] a clue as to where the biggest degree of fire was or the largest value of fire." He then determines whether the cause of the fire was accidental, incendiary, or undetermined based on the "heat source" of the fire, or the material that ignited and initially caused the fire. Mr. McClure explained that a heat source could be a match, a cigarette, a chemical reaction, or "radiant heat from an appliance."

Mr. McClure testified that around 5 a.m. on the morning of February 21, 2014, he was assigned to investigate the fire at Smith's Tire Barn on Highway 79. After arriving at the scene, he observed "a burn structure that was still smoking." Mr. McClure noted that the walls and roof of the structure had collapsed. He then "notified [his] agent in charge out of Jackson and requested additional help." When the additional agents arrived at the scene, Mr. McClure "requested a ladder truck and started doing some aerial photos of the structure[,]" which he used "to look at the top side of the structure to see where the fire maybe had breached or burned through the roof to kind of give [him] a better understanding." He explained that generally, if an object does not block the spread of a fire, "the fire burns up and out[.]" When the fire reaches the ceiling of the structure, the fire continues to spread, and "generally it will breach through a roof or a structure once it burns through the ceiling." Mr. McClure stated that because Smith's Tire Barn contained rubber tires and oil, he believed it would be hard to determine the heat source of the fire "because of the massive amount of fuel load," or "things that burn inside the structure." He testified that the "degree of burn" at the scene, or the amount of charring the structure sustained, was extensive.

By using the ladder truck to observe the aerial view of the structure, Mr. McClure determined that the fire had "a higher degree of intensity[]" in the area "toward the back [and] to the left of the office" because "the roofing material . . . had almost burned completely through [compared to] the other areas of the structure." He explained that fire generally burns for the longest amount of time at the location where the fire started. Mr. McClure stated that the walls and roof of the structure were metal and that the location of the high intensity area indicated that the fire possibly started at that location or that the "fuel load" was located in that area. He explained that a larger volume of "fuel load" would "naturally . . . burn more and create more fire volume." Mr. McClure then obtained a sketch of the structure drawn by co-defendant William Tomlan, which depicted the layout of the contents of the structure. After the Defendant, who owned Smith's Tire Barn, consented to an examination of the interior of the structure, Mr. McClure "found a lot of metal bands from tires, where there were tires piled up[]" and

four steel tire racks. He noted that one rack was "perfectly intact and straight up," but another rack was "starting to . . . drop down." Mr. McClure testified that a fiberglass boat was found in "south end" of the structure "to the right of the office[.]" Mr. McClure also found a van located to the left of the boat. He noted that the top of the van was made of fiberglass, which "was melted down kind of like the boat was[,]" but the boat sustained more damage than the van. He observed that the portion of the structure where the boat was located was still standing, but the portion where the office was located was not. He stated that, based on his examination, he could not determine whether the fire was more intense in the area to the left of the office because the fire began there or because the large amount of tire tubes was the "fuel load" of the fire. Mr. McClure testified that he took pictures of the scene, and the pictures were admitted into evidence.

After Mr. McClure investigated the scene of the fire, he spoke with the District Attorney's Office and took out a warrant for arson against the Defendant. He also spoke with co-defendant William Tomlan at the jail after informing him of his *Miranda* rights; based on his communication with co-defendant William Tomlan, Mr. McClure obtained a warrant to search for a safe in a storage building on the Defendant's property. He observed tire tracks leading to the storage building at issue. Inside the storage building, Mr. McClure observed "a cabinet, like kitchen cabinets, sitting on top of the safe" with a window blind draped over the safe. He obtained a second warrant to open the safe, but the safe was empty. Mr. McClure concluded that the fire at Smith's Tire Barn was "incendiary," meaning an individual had set the fire, but he could not determine what caused the fire.

On cross-examination, Mr. McClure explained that, if co-defendant William Tomlan had not sketched the contents of the structure, he still would have inspected the interior of the structure. Mr. McClure stated that prior to arresting the Defendant, the Defendant agreed to be interviewed by Mr. McClure; however, the Defendant did not attend the interview. Mr. McClure agreed that, after the Defendant did not attend the scheduled interview, the Defendant's trial counsel called Mr. McClure to set up another interview, but Mr. McClure was out of town. He also agreed that, after he obtained a warrant to open the safe, the Defendant agreed to open the safe. Mr. McClure stated that the cabinet sitting on top of the safe in the storage building did not fit around the safe, and it "was as wide as the safe." He explained that he obtained a warrant to arrest the Defendant for arson "based on what [he] saw at the scene, all the interviews, [and] the confessions or statements from the co-defendants." Mr. McClure stated that he had no evidence that the Defendant set the fire or was at the scene of the fire. Mr. McClure further explained his reasoning for arresting the Defendant for arson in the following exchange:

DEFENSE COUNSEL: Okay. So you're telling me the only basis for the arrest of [the Defendant] [was] the interviews and statements of the co[-]defendants in this case?

MR. MCCLURE: And the fact that I couldn't call the fire. If I called -- if I could have found an accidental reason for the fire, I wouldn't have called it incendiary, because there would have been a conflict in judgment there. But based on a totality of the case and the interviews, the [District Attorney's Office] instructed me to issue a warrant for [the Defendant].

DEFENSE COUNSEL: Okay. What evidence, . . . other than the testimony of the statements of the co[-]defendants[,] do you have that places [the Defendant] at the scene of the fire or instructing anyone to set the fire, outside of those statements, do you have any other evidence that supports that?

MR. MCCLURE: All the evidence that I have was based on co[-]defendants.

Mr. McClure stated that he obtained a subpoena for the Defendant's phone records as well as the records from the Defendant's wife's phone, but he did not find any evidence in the phone records that linked the Defendant to co-defendants Diane and William Tomlan or co-defendant Alred. Mr. McClure stated that he had no independent knowledge, outside of the co-defendants' statements, that linked the Defendant to the fire at Smith's Tire Barn.

On redirect-examination, Mr. McClure stated that evidence at the scene, such as the fact that he found a damaged boat and van in the structure, corroborated the statement of co-defendant William Tomlan. He also stated the location where the safe was found corroborated the statement of co-defendant William Tomlan. On recross-examination, Mr. McClure agreed that the structure at issue was a mechanic shop and that he would expect to find vehicles, such as a boat or a van, at a shop because the vehicles needed to be repaired.

Robert Dooley testified that he was a field team supervisor for Federated Mutual Insurance Company and that he supervised field adjusters and handled "large, complicated property losses." Mr. Dooley stated that he was the insurance adjuster who investigated the loss of the property at Smith's Tire Barn. He explained that the Defendant owned an insurance policy that insured Smith's Tire Barn and that Federated Mutual Insurance Company covered that policy. Mr. Dooley stated that the Defendant

created the insurance policy on Smith's Tire Barn on August 30, 2013, in the amount of $1,200,000 for the building and $800,000 for the contents. He explained that, at his company, the marketing representatives assist the property owner in choosing the coverage amounts for each building,[3] but he noted that the coverage value for contents is "usually set by the business owner." Mr. Dooley stated that, after a business owner placed a value on the contents of a building and the policy was written, the field services division would send a company representative or independent contractor to "come out and do a post-inspection to make sure the building has the proper value of insurance on it." After inspecting, the representative would then write an "engineering report to support the value of the structure that was written on the policy." However, he stated that a representative attempted to inspect the Defendant's business at Smith's Tire Barn "on multiple occasions" but was unsuccessful.

Mr. Dooley stated that the morning of February 21, 2014, the Defendant "called in the fire loss to Federated Insurance through [its] claim contact center." He stated that he briefly spoke to the Defendant the morning after the fire, but he did not speak to the Defendant again until his company conducted an "examination under oath" with the Defendant. He explained that, if a claim was made on the Defendant's insurance policy covering Smith's Tire Barn, his company would have to "pay out for a covered loss[.]"

Co-defendant Diane Tomlan[4] testified that on February 20, 2014, she lived in a mobile home on Highway 69 and that the property where the home was located was owned by the Defendant. She stated that co-defendant William Tomlan lived in a separate mobile home on the Defendant's property and explained that she had previously been married to co-defendant William Tomlan. She and the Defendant had a "verbal lease agreement" that she would pay the electricity bill for the mobile home; she also stated that she occasionally paid rent to the Defendant and that the Defendant gave her money "about twice a week[.]" Co-defendant Diane Tomlan met the Defendant when co-defendant William Tomlan began working for the Defendant; she explained that she frequently visited Smith's Tire Barn to "hang out, visit, and talk" with the Defendant because he and his wife "wanted to start a relationship with [her]." Co-defendant Diane Tomlan stated that at the time of the offense she was in a romantic relationship with the Defendant. She stated that "[he] would come and stay two or three nights out [of] the week with [her] in that [mobile home]." She stated that her son, co-defendant Michael Alred, lived with her in the mobile home; however, the Defendant did not want her son to live with her because her son would "take up" for her when she had a disagreement with the Defendant. Co-defendant Diane Tomlan stated that, if she went "somewhere [that the

---

[3] Mr. Dooley explained that the marketing representatives use a "square footage evaluator tool" which supplies a factor depending on whether the building's structure is masonry or metal; the tool uses that factor to estimate a cost per square foot to rebuild the building.

[4] At trial, only two of the three co-defendants, Diane and William Tomlan, testified.

Defendant] didn't want [her] to be," such as a friend's house, the Defendant would take her car because he held a lien on the vehicle, and he and co-defendant William Tomlan would remove her possessions from the mobile home.

Co-defendant Diane Tomlan explained that the Defendant told her about his finances and that he was "in a bind." One to three months before the offense, the Defendant told her that he had a $2,500,000 insurance policy on the property of Smith's Tire Barn and that the insurance policy "would help him get out of debt[.]" The Defendant told her that he wanted Smith's Tire Barn to be burned down to "get him out of debt[.]" She explained that, a few days prior to the offense, the Defendant had shown her a safe in the office of Smith's Tire Barn and explained to her that "he could put things in there, and no one could break into it." Co-defendant Diane Tomlan also stated that, for "months" prior to the offense, the Defendant kept a boat on a trailer outside of Smith's Tire Barn, "[c]lose to the road."

She stated that around February 20, 2014, she was "getting along" with her ex-husband, co-defendant William Tomlan. That day, she "hung out" at Smith's Tire Barn with the Defendant, co-defendant William Tomlan, and some customers. She stated that the Defendant wanted co-defendant William Tomlan to take the safe from the office of Smith's Tire Barn to the Defendant's storage on the property where co-defendants Diane and William Tomlan lived. Around 6:00 p.m., she saw the Defendant and co-defendant William Tomlan "load [the safe] up and take it to the storage." Afterwards, she went back to her house and watched television; around 8:00 p.m., the Defendant walked to her house to "arrange" the plan to burn down Smith's Tire Barn. She stated that the Defendant was "all excited, anxious and everything," and he wanted her to "take [co-defendant William Tomlan] down [to Smith's Tire Barn], drop him off, turn around and come back and pick [co-defendant William Tomlan] up." In return for driving co-defendant William Tomlan to Smith's Tire Barn, the Defendant "show[ed] [co-defendants Diane and William Tomlan] pictures on the computer at the shop of houses like, $250,000 homes that he would want to set [sic] [them] all up in." She was also afraid that, if she did not cooperate, the Defendant would "try to put [her] out again like he [had] before . . . ." After a few minutes, the Defendant drove co-defendant Diane Tomlan to co-defendant William Tomlan's mobile home in her vehicle, a red Chevrolet Cavalier. She and the Defendant went into co-defendant William Tomlan's mobile home, and he and the Defendant discussed which vehicle to take down to Smith's Tire Barn and "how and where to get it started at, the fire." The Defendant and co-defendant William Tomlan decided to drive co-defendant William Tomlan's Dodge truck because the Defendant owned the Cavalier. The Defendant stayed at co-defendant William Tomlan's mobile home for "a good couple [of] hours[;]" after he left, co-defendant Alred arrived at co-defendant William Tomlan's mobile home.

Around 1:00 a.m., co-defendants Diane and William Tomlan and co-defendant Alred drove to Smith's Tire Barn; co-defendant Diane Tomlan dropped co-defendant William Tomlan and co-defendant Alred off at the road near "[t]he first driveway of the shop." She then "went down a little ways," like the Defendant instructed her to, "and then [she] turned around to come back and pick them up." By the time co-defendant Diane Tomlan arrived back at Smith's Tire Barn to pick up co-defendant William Tomlan and co-defendant Alred, Officer Davis had pulled up, and Smith's Tire Barn "was going up in flames." She stated that Officer Davis told her to pull her vehicle into the "next parking lot[,]" which she did. Later, co-defendants Diane and William Tomlan and co-defendant Alred drove to the police station. Co-defendant Diane Tomlan stated that she was arrested and pled guilty to facilitation to commit arson; she received a sentence of three years of probation and was ordered to pay restitution.

On cross-examination, co-defendant Diane Tomlan agreed that the Defendant had previously filed an eviction action against her in general sessions court and that she and the Defendant reached an agreement on January 27, 2014, that she would not allow co-defendant Alred to live on the property, that she would clean up the property, and that she would "maintain her dogs and people." She agreed that the parties were ordered to review the agreement on March 24, 2014, to determine if she had complied with the original agreement. Co-defendant Diane Tomlan agreed that she had previously pled guilty to two counts of theft. She further agreed that previously she had been pulled over in a traffic stop and that the police seized her vehicle. She stated that after she arrived at the Sheriff's Department on the morning of February 21, 2014, she gave a written statement that she, co-defendant William Tomlan, and co-defendant Alred were returning from co-defendant William Tomlan's son's house in Dover when Officer Davis found them at the scene of the fire. She alleged that co-defendant William Tomlan told her to say this after they were stopped by Officer Davis. Co-defendant Diane Tomlan additionally stated that she did not see the Defendant or co-defendant William Tomlan moving a boat into the building of Smith's Tire Barn; she clarified that she had always seen it sitting outside, but she "didn't pay attention to what all they put in [Smith's Tire Barn]." She agreed that the Defendant would buy or trade various vehicles, boats, or motorcycles that he would then repair and sell. She also stated that she did not know if anything was stored in the safe in the office of Smith's Tire Barn. Co-defendant Diane Tomlan agreed that her plea agreement for her conviction of criminal facilitation to commit arson required her to pay restitution, jointly and severally, with co-defendant William Tomlan and co-defendant Alred; however, the plea agreement stated that her probation would not be violated solely on the ground that she failed to pay restitution in full by the expiration of her sentence. She stated that she had not paid any restitution yet.

On redirect-examination, co-defendant Diane Tomlan stated that she receives $780 in disability benefits each month and that she has been following the instructions of her

probation officer. She stated that she planned on making a restitution payment before her next meeting with her probation officer. Co-defendant Diane Tomlan testified that co-defendant Alred was present during some of the conversations between her and the Defendant regarding the plan to burn down Smith's Tire Barn.

Co-defendant William Tomlan testified that, at the time of the offense, he had worked for the Defendant for nine or ten years as a mechanic. He stated that he was married to co-defendant Diane Tomlan when he began working for the Defendant, but they divorced after three or four years of marriage. Co-defendant William Tomlan testified that, prior to the offense, the Defendant "was a real[ly] good friend" and lent co-defendant William Tomlan money. He acknowledged that the Defendant had previously accused him of theft of tires; however, the Defendant dropped the charges, and he continued to work for the Defendant. Co-defendant William Tomlan stated that he generally worked six days a week and that the Defendant typically gave him $150 to $200 a week, either in wages or as a loan. He noted that on February 20, 2014, he lived in a mobile home on the Defendant's property. He explained that he paid the Defendant approximately $100 in rent, and he was responsible for his utilities. Co-defendant William Tomlan explained that the Defendant typically took his rent payment out of his wages. He also noted that he purchased his vehicle from the Defendant, and the Defendant also subtracted the payment for the vehicle from his wages.

At some point before the offense, co-defendant William Tomlan helped the Defendant move a heavy, gray safe from the office of Smith's Tire Barn to a storage building on the Defendant's property. He stated that the Defendant kept a cabinet on top of the safe, and the safe had been in the office for over a year. He had previously seen the foreman of the shop, Rob Quinn, open the safe, but he never observed what the Defendant kept in the safe, if anything. The Defendant owned a "wrecker," which the Defendant and co-defendant William Tomlan used to move the safe. He also stated that the Defendant had previously discussed the insurance policy on Smith's Tire Barn with him. Co-defendant William Tomlan testified that on the morning of February 20, 2014, he went to work at Smith's Tire Barn around 7 a.m. He worked with tires at the shop, and the Defendant asked another worker, Dave Smith, to put a "switch" into an older van that had previously been parked out in front of the shop. Co-defendant William Tomlan said that the van that was moved into the shop was the same "kind" of van as the burned vehicle pictured in one of the photographs that Mr. McClure took of the scene, but he stated that it was hard to determine if it was the same van because the paint had burned off. He stated that Mr. Smith pulled the van into the shop to the right of the office. He explained that the reason that the Defendant pulled the van and the boat into the shop was so that, if a fire started, there would be enough material for the fire to consume so that the structure would be "burned all the way." He stated that the Defendant mentioned that "fiberglass will burn quick with a fiber heading and gas tanks."

Co-defendant William Tomlan testified that after he finished work on February 20, 2014, he went home; approximately thirty minutes to one hour after he arrived home, the Defendant came to his residence. The Defendant told him that Smith's Tire Barn was going to close because the Defendant owed back taxes. The Defendant stated that he wanted "this t[aken] care of pretty soon[]" because "a new insurance guy [was] coming in, and [he] might find problems wrong with the building itself and stop his insurance." The Defendant said that he was going to go home, take a Valium, and lay down; then, he would send co-defendant Diane Tomlan and co-defendant Alred to co-defendant William Tomlan's house. The Defendant said he was "going to take a piece of cardboard on the [tire] tubes and push it over[,]" and he told co-defendant William Tomlan to run into the shop, light the cardboard, and get out. After the Defendant left his house, co-defendant Diane Tomlan and co-defendant Alred came to his house, and they watched television together. Co-defendant Diane Tomlan and co-defendant Alred left his house, but they came back around 1:30 or 2:00 a.m. He stated that co-defendant Diane Tomlan drove him and co-defendant Alred to Smith's Tire Barn that morning in his pickup truck; they used his truck because the Defendant had placed a tracking device on co-defendant Diane Tomlan's vehicle. He explained that he always carried a lighter with him and that he had a lighter that night. Co-defendant Diane Tomlan "pulled over on the side of the road," and co-defendant William Tomlan and co-defendant Alred got out of the truck. Co-defendant Alred stood outside of the building while co-defendant William Tomlan went into the building through the unlocked front door, "[w]ent straight to the [tire] tubes in the back[,]" lit the cardboard on fire, and exited the structure. He and co-defendant Alred went back towards the road, but co-defendant Diane Tomlan had driven away and she was in the process of turning around to come back. Before she could reach them, however, Officer Davis arrived. Officer Davis asked co-defendant William Tomlan and co-defendant Alred to wait in the parking lot of a nearby business while he called emergency responders. Co-defendant William Tomlan stated that he, co-defendant Diane Tomlan, and co-defendant Alred later drove to the Henry County Sheriff's Department, and they were arrested. He stated that he was convicted of arson and was sentenced to four years of probation. He explained that he agreed to commit arson because the Defendant told him and co-defendant Diane Tomlan that the Defendant would purchase property for them.

On cross-examination, co-defendant William Tomlan stated that, at the scene of the fire, when Officer Davis asked him where he was coming from, he told Officer Davis that he had been at his son's house in Dover and that he and co-defendant Diane Tomlan had seen the fire at Smith's Tire Barn on their way back. He admitted that his initial explanation to Officer Davis was untruthful. He explained that on February 20, 2014, he arrived at Smith's Tire Barn before the Defendant and opened the shop with his keys; however, he explained that he did not use his keys to unlock the shop when he set the fire

because his keys were in his residence. He stated that the Defendant told him several weeks before the offense that an insurance employee was coming to Smith's Tire Barn. Co-defendant William Tomlan stated that some water lines in the office of Smith's Tire Barn had frozen and broken open shortly before the offense. He agreed that some items had been moved out of the office because of the broken water lines, but he stated that the safe was not moved out of the office because of the broken water lines. He also stated that he had observed the Defendant open the safe approximately one or two weeks before the offense; however, he did not know the contents of the safe. He agreed that he pled guilty to arson for the current offense and that he was ordered to pay restitution. He also agreed that he pled guilty to theft of tires in 2008. He stated that he had not made any payments toward the restitution. On redirect examination, co-defendant William Tomlan stated that the Defendant told him the insurance policy on Smith's Tire Barn was a 2.5 million dollar policy. The Defendant also told him that "if everything in the building g[o]t burned up, the insurance company [would] take care of everybody until a certain period of time." On recross-examination, he stated that he never observed the paperwork for the Defendant's insurance policy.

After the State rested, the Defendant moved for a judgment of acquittal on the grounds that the State failed to independently corroborate the testimony of co-defendants Diane and William Tomlan. The Defendant also argued that the State "failed to prove every element of the crime that [the State] alleged [the Defendant] committed." The trial court denied the Defendant's motion and found "that there [was] enough evidence of corroboration to get past the [D]efendant's motion for [judgment of acquittal]" based on the location of the boat and van inside the structure of Smith's Tire Barn, as well as the location of the safe in the storage building. The jury convicted the Defendant of the lesser-included offense of attempted arson. The trial court sentenced the Defendant as a Range I, standard offender to three years and ordered the Defendant to serve one year in the workhouse and two years on community corrections. The judgment of conviction was filed on March 29, 2016.

On April 28, 2016, the Defendant filed a motion for new trial, arguing that the evidence presented by the State at trial did not sufficiently provide independent corroboration of the testimony of co-defendants Diane and William Tomlan. The Defendant also argued that the jury's verdict was inconsistent with the evidence admitted at trial. The trial court denied the Defendant's motion and approved the jury's verdict in a written order filed on June 20, 2016. The trial court found that the fact that Mr. McClure found a burned boat and van inside Smith's Tire Barn and the Defendant's safe in a storage building provided sufficient independent corroboration of the testimony of co-defendants Diane and William Tomlan. The Defendant filed his notice of appeal on June 9, 2016.

## II. Analysis

The Defendant argues that the trial court erred in its denial of his motion for judgment of acquittal and his motion for new trial because the evidence introduced at trial was insufficient to independently corroborate the testimony of co-defendants Diane and William Tomlan. The State responds that the Defendant's filing of his motion for new trial was untimely, and his filing of his notice of appeal is therefore untimely.

Tennessee Rule of Criminal Procedure 33(b) requires that a motion for new trial be made in writing and filed within thirty days of the date the sentencing order is entered. The trial court may not extend this time limit. Tenn. R. Crim. P. 45(b)(3). An untimely filed motion for new trial is a nullity and will not toll the thirty-day time period for filing a notice of appeal. *State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987); *see* Tenn. R. App. P. 4(c). "[T]he effective date for entry of a judgment or order of sentence is the date of its filing with the court clerk after being signed by the judge." *State v. Stephens*, 264 S.W.3d 719, 729 (Tenn. Crim. App. 2007); s*ee also State v. Willie Norman*, No. W2003-02067-CCA-R3-CD, 2004 WL 2255253, at *5 (Tenn. Crim. App. Oct. 7, 2004), *perm. app. denied* (Tenn. Mar. 7, 2005) (concluding that the notice of appeal was timely filed based on the date that the trial court clerk filed the judgment).

In this case, the signed judgment of conviction was filed by the trial court clerk on March 29, 2016. The Defendant's motion for new trial was filed within thirty days of that date on April 28, 2016. The trial court entered an order denying the motion for new trial nunc pro tunc on May 11, 2016, which was filed on June 20, 2016. The Defendant filed a notice of appeal on June 9, 2016.[5] The Defendant's motion for new trial and notice of appeal were both timely filed.

### *Motion for Judgment of Acquittal and Motion for New Trial*

Under Tennessee Rule of Criminal Procedure 29, a trial court "shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(b). Whether to grant a motion for judgment of acquittal is a question of law, and the trial court must look at the State's evidence in the light most favorable to the State and must "allow all reasonable inferences from it in the State's favor; to discard all countervailing

---

[5] Tennessee Rule of Appellate Procedure 4(d) states that "[a] prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof." Tenn. R. App. P. 4(d); *see State v. Jason Peter Meeks*, No. M2011-01134-CCA-R3-CD, 2012 WL 3085563, at * 1 n.1(Tenn. Crim. App. July 31, 2012).

evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the evidence of the State," the trial court must deny the defendant's motion for judgment of acquittal. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). In ruling on a motion for judgment of acquittal, the trial court looks at the legal sufficiency of the evidence and does not weigh the evidence. *Id.* "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction[,]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013),whether, when the evidence is viewed in the light most favorable to the State, any rational juror could have found the defendant guilty of the offense beyond a reasonable doubt. *State v. Collier*, 411 S.W.3d 886, 893-94 (Tenn. 2013).

Rule 33(d) of the Tennessee Rules of Criminal Procedure states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule is the modern equivalent of the "thirteenth juror rule" and requires the trial court to weigh the evidence and grant a new trial "if the evidence preponderates against the weight of the verdict." *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). Our supreme court has stated that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[] and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). When a trial judge overrules a motion for new trial, absent any evidence that the trial court expressed dissatisfaction or disagreement with the weight of the evidence or the verdict, this court presumes that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the sufficiency of the evidence. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

Because the Defendant's argument regarding the motion for judgment of acquittal is essentially a sufficiency of the evidence claim and because the trial court fulfilled its role as thirteenth juror, we will address the Defendant's arguments relating to his motion for judgment of acquittal and motion for new trial as raising one issue – the sufficiency of the evidence.

*Sufficiency of the Evidence*

The Defendant argues that the evidence introduced at trial was insufficient for a rational juror to find him guilty of attempted arson beyond a reasonable doubt because the State did not present sufficient evidence to independently corroborate the testimony of co-defendants Diane and William Tomlan. The State contends that the testimony of

co-defendants Diane and William Tomlan was sufficiently corroborated and that the proof introduced at trial was consistent with attempted arson.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant to this opinion, a defendant commits arson "who knowingly damages any structure by means of a fire or explosion . . . [w]ith intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose." Tenn. Code Ann. § 39-14-301(a)(2) (2014). A defendant is guilty under a theory of criminal responsibility if:

> [a]cting with the culpability required for the offense, the [defendant] causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense . . . [or] [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(1)-(2) (2014). A defendant attempts to commit a criminal offense when he, in pertinent part, "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Tenn. Code Ann. § 39-12-101(a)(2) (2014).

- 14 -

It is well-established in Tennessee case law that "a conviction may not be based upon the uncorroborated testimony of an accomplice." *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citing *Monts v. State*, 379 S.W.2d 34, 43 (1964); *Stanley v. State*, 222 S.W.2d 384 (1949)), *superseded on other grounds by statute*. An accomplice is "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *Collier*, 411 S.W.3d at 894 (citing *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004); *Clapp v. State*, 30 S.W. 214, 216 (1895)). A witness is an accomplice of the defendant if "the alleged accomplice could be indicted for the same offense charged against the defendant." *Id.* (quoting *Monts*, 379 S.W.2d at 43). "Whether a witness'[s] testimony has been sufficiently corroborated is a matter entrusted to the jury as the trier of fact." *Bigbee*, 885 S.W.2d at 803. Our supreme court has described the amount of evidence needed to corroborate an accomplice's testimony as the following:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Id.* (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). "[O]nly slight circumstances are required to corroborate an accomplice's testimony." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997) (internal citations omitted). However, "[e]vidence which merely casts a suspicion on the [defendant] or establishes [that the defendant] had an opportunity to commit the crime in question" and "evidence that the accused was present at the [location] of the crime" is insufficient to corroborate an accomplice's testimony. *Id.* (citing *Bolton v. State*, 377 S.W.2d 936, 939 (Tenn. 1964); *Mathis v. State*, 590 S.W.2d 449, 455 (Tenn. 1979)). "Where there are multiple accomplices there must be additional corroboration, since accomplices cannot corroborate each other." *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995) (citing *Bethany v. State*, 565 S.W.2d 900 (Tenn. Crim. App. 1978)); *see also State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001).

Here, both the State and the Defendant agree on appeal that co-defendants Diane and William Tomlan were accomplices of the Defendant and that the trial court properly instructed the jury that co-defendants Diane and William Tomlan were accomplices. Viewing the evidence in the light most favorable to the State, we conclude that the State introduced sufficient evidence that independently corroborated the testimony of co-defendants Diane and William Tomlan. Both co-defendants testified that the Defendant informed them that he had a large insurance policy on Smith's Tire Barn, and Mr. Dooley testified that his company covered an insurance policy owned by the Defendant for $1,200,000 on the building and $800,000 on the contents for Smith's Tire Barn. Co-defendant William Tomlan testified that the Defendant told him that they needed to burn Smith's Tire Barn down before the insurance company sent a new insurance agent out to inspect the property. Mr. Dooley stated that his company had attempted to send an agent to inspect the Defendant's property several times but was unsuccessful. Both of these facts involving the Defendant's insurance policy independently corroborate the testimony of co-defendants Diane and William Tomlan, as well as establish the Defendant's identity and motive for the crime.

Further, co-defendant William Tomlan testified that the Defendant moved a van into Smith's Tire Barn that had previously been stored outside the shop; he stated that the Defendant's purpose in moving the van was to provide fuel for the fire. Mr. McClure found a burned van in one of the bays of Smith's Tire Barn during his investigation. Additionally, co-defendant William Tomlan stated that the Defendant pulled a boat into Smith's Tire Barn for the same purpose as the van, to provide fuel for a fire. Mr. McClure also found a burned fiberglass boat in Smith's Tire Barn. Co-defendant William Tomlan testified that, before the fire, the Defendant asked him to help move the safe with a cabinet stored on it from the office of Smith's Tire Barn to a storage unit located in a different area of the Defendant's property. During Mr. McClure's investigation, he searched a storage unit on the Defendant's property and located a large safe with a cabinet on top. Additionally, co-defendant William Tomlan testified that the Defendant stated he was going to place cardboard in the area of the shop near the racks of tire tubes and that he instructed co-defendant William Tomlan to light the cardboard on fire. Co-defendant William Tomlan testified that he ran into the shop, lit the cardboard on fire, and exited the building. Although Mr. McClure could not determine the source of the fire, he determined that the fire was incendiary in nature and that the location of the highest intensity burn was in the area where he found partially melted racks. Mr. McClure testified that this area had the highest intensity burn because either there was a large fuel load there or because the fire started at that location. While Mr. McClure's conclusions regarding the location of the highest intensity burn are not direct evidence of the Defendant's involvement, the conclusions are independent evidence that corroborates co-defendant William Tomlan's testimony.

Because the State introduced sufficient evidence at trial to independently corroborate the testimony of co-defendants Diane and William Tomlan and to connect the Defendant to the crime, we conclude that there was sufficient evidence for a rational jury to find the Defendant guilty of attempted arson beyond a reasonable doubt. The Defendant is not entitled to relief on this ground.

*Jury Instruction on Attempted Arson*

Additionally, the Defendant argues that the trial court erred by instructing the jury on attempted arson because the State did not present sufficient evidence to independently corroborate the testimony of co-defendants Diane and William Tomlan.

In Tennessee, a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000) (citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Additionally, trial courts have a duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). Questions regarding the propriety of jury instructions are mixed questions of law and fact; thus, our standard of review is de novo with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001). A reviewing court should "view the instruction in the context of the charge as a whole." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014) (citing *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008); *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997)). A jury instruction is prejudicial error that requires reversal when it "so infected the entire trial that the resulting conviction violates due process[,]" *Rimmer*, 250 S.W.3d at 31, or when the instruction, "when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Majors*, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)). Although the Defendant failed to object to the trial court's instruction on attempted arson at trial, a defendant may raise a challenge to "positive errors" in jury instructions for the first time in a motion for new trial. *See State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996) (citing Tenn. R. Crim. App. 30(b); *State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986).

As relevant here, "An offense is a lesser[-]included offense if: (1) [a]ll of its statutory elements are included within the statutory elements of the offense charged; [or] (3) [t]he offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser[-]included offense in subdivision (f)(1)[.]" Tenn. Code Ann. § 40-18-110(f)(1),(3) (Supp. 2011). Therefore, attempted arson is a lesser[-]included offense of arson, the offense for which the Defendant was indicted. Tennessee

Code Annotated section 40-18-110(a) provides the standard for determining whether the evidence is sufficient to require an instruction on a lesser[-]included offense, stating:

> . . . [T]he trial judge shall not instruct the jury as to any lesser[-]included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser[-]included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser[-]included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser[-]included offense.

Tenn. Code Ann. § 40-18-110(a) (Supp. 2011). In *State v. Thorpe*, our supreme court stated the following:

> [i]n light of our legislature's specific provision that "it is no defense to prosecution for criminal attempt that the offense attempted was actually committed," Tenn[essee] Code Ann[otated] [section] 39[-]12-101(c), we hold that proof, even uncontroverted proof, that a defendant completed a crime, in and of itself, does not shield a defendant from a conviction for criminal attempt of the crime allegedly completed. Moreover, the State need not adduce proof in a prosecution for criminal attempt that the defendant failed to complete the target crime. Proof sufficient to support a defendant's conviction of [the completed crime] is, logically and legally, sufficient to support that defendant's conviction of criminal attempt to commit [the completed crime].

*State v. Thorpe*, 463 S.W.3d 851, 863 (Tenn. 2015). Our supreme court also held that "criminal attempt is available as a lesser-included offense of any charged offense in every case in which: (1) the charged offense has a requisite intent element; and (2) the proof has fairly raised the completed offense." *Id.*

In this case, the trial court gave the following instruction on attempted arson to the jury:

> Any person who attempts to commit a criminal offense is guilty of a crime.

For you to find a person guilty of criminal attempt to commit arson, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant intended to commit the specific offense of arson; and

(2) that the defendant did some act intending to cause an essential element of arson to occur, and at the time believed the act would cause the element to occur without further action on the part of the defendant. …

The jury instructions defined the essential elements of arson as the following:

(1) that the defendant knowingly damaged a structure by means of fire or explosion; and

(2) that the defendant did so with intent to destroy or damage the structure to collect insurance for the damage or destruction.

As we concluded above, the State presented sufficient independent evidence to corroborate the testimony of co-defendants Diane and William Tomlan. Co-defendant William Tomlan testified that the Defendant wanted to burn Smith's Tire Barn down before Federated Mutual Insurance Company sent an insurance agent to inspect the property. He also testified that the Defendant placed cardboard inside Smith's Tire Barn, and he instructed co-defendant William Tomlan to drive down to Smith's Tire Barn, walk into the building, and light the cardboard on fire. This testimony is circumstantial evidence that the Defendant acted to intentionally cause co-defendants Diane and William Tomlan to knowingly damage Smith's Tire Barn through fire with the intent to collect insurance for the damage from Federated Mutual Insurance Company. *See* Tenn. Code Ann. § 39-12-101(a) (2016). We conclude, after a de novo review of the evidence, that there was evidence in the record to support an instruction on attempted arson. The Defendant is not entitled to relief on this ground.

### III. Conclusion

After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY JR., JUDGE

- 19 -